**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARIANNA TENDICK and PETER HAHN, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | <u>CLASS ACTION</u> |
| v. | **COMPLAINT** |
| VISION SERVICE PLAN, | |
| Defendant. | |

Plaintiffs Marianna Tendick and Peter Hahn ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Vision Service Plan ("Defendant").

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all individuals who have, prior to August 2024, accessed and used www.VSP.com, a website Defendant Vision Service Plan ("VSP" or "Defendant") owns and operates.

2.      Plaintiffs bring this class action against VSP for its failure to properly secure and safeguard its patients' sensitive health information, including details about their medical conditions, prescriptions, doctors' appointments, and other information submitted on VSP's website and related subpages.

3.      Defendant offers vision care benefit plans through its website, VSP.com, which also helps to connect website visitors, patients, and plan members with doctors and vision care services. Through VSP.com, users can search for providers in their local area and connect with providers to book an appointment. Consumers can also use the website to search for eye doctors and optometrists, learn about various eye conditions, pay for medical eye services, explore eye care insurance options, shop for eyewear and accessories, and more.[1]

4.      Consumers on VSP's website communicate their private information via the site, including details about their medical conditions and treatments related to their eyes.

5.      Unbeknownst to consumers, VSP surreptitiously shares with Meta Platforms, Inc. ("Meta")[2] and Google LLC ("Google") users' private information without their consent, including but not limited to: (a) the date and time users log in to their member profiles; (b) the types of eyecare services and products users are seeking; (c) the name, gender, language, type, and specialty of the physician with whom users are seeking treatment; (d) the locations where users are seeking treatment; (e) any medical conditions users research, and (f) when users click

---

[1] See, *VPS vision care*, VSP.com (last accessed May 1, 2024).

[2] Formerly known as Facebook, Inc. until 2021.

to make a telephone call to schedule an appointment through the site. In addition to these categories of private information, VSP also surreptitiously discloses users' Facebook IDs ("FIDs") to Meta and users' IP addresses to Google.

6.     Prior to the class period, VSP procured and embedded multiple invisible 1x1 tracking pixels on www.VSP.com and its subpages, which then deployed on each users' internet browsers to intercept and disclose to Meta and Google Plaintiffs' and other patients' health-related electronic communications with VSP's website and subpages.

7.     The tracking pixels referred to as the Meta Pixel and Google Analytics are snippets of JavaScript code offered by Meta and Google that can be embedded on a third-party website, such as VSP.com, to track users' actions as they navigate through the website. The JavaScript code logs the pages users visit, the buttons they click, the information they type into forms and search bars, and more.[3] The Meta Pixel and Google Analytics then send this harvested information to Meta and Google respectively, where it can be stored for years.[4]

8.     When VSP intentionally and surreptitiously embedded the Meta Pixel and Google Analytics on its website and related subpages, VSP shared with Meta and Google every patient's interaction with its website and related subpages without Plaintiffs' or its other users' knowledge or consent. Meta and Google then aggregated this data across all websites equipped with the Meta Pixel and Google analytics to build an individual dossier of each patient's activity, labeled with the patient's IP address, and matched to the patient's Facebook and/or Instagram account (or lack thereof).[5]

---

[3] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive- medical-information-from-hospital-websites.

[4] *Meta Business Tools Terms*, Facebook, https://www.facebook.com/legal/terms/businesstools (last visited May 1, 2024); *How Google Analytics Works*, Google, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939 (last visited May 1, 2024)

[5] *Id*.

9.    As a result of VSP's use of the Meta Pixel and Google Analytics, Plaintiffs' and Class Members' communications, personally identifying information, and sensitive health information was disclosed to Meta and Google without their authorization or consent. This sensitive health information includes but is not limited to information about their healthcare providers and service locations; types of conditions and treatments researched; dates and times of doctor's appointments along with reasons for requesting an appointment, computer IP addresses, and other personally identifying information.

10.    Additionally, if a patient was logged in to Facebook when they visited VSP's website and related subpages where the Meta Pixel was embedded, Meta linked their sensitive health information to their Facebook account.

11.    As a healthcare provider, VSP is required by law to provide every patient with a Notice of Privacy Practices. In its Notice of Privacy Practices, VSP clearly states that it is "required by law to maintain the privacy and security of [patient's] protected health information."[6]

12.    Despite VSP's promise to maintain the privacy and security of its patients' sensitive health information, VSP nevertheless intentionally chose to embed the Meta Pixel and Google Analytics on its website and subpages, sharing Plaintiffs' and Class Members' sensitive health information with Meta and Google without their consent when they communicated with VSP's website and subpages.

13.    The disclosure of Plaintiffs' and Class Members' sensitive health information enabled Meta and Google to gain intimate insight into the types of medical care and medical treatments patients sought from VSP.

14.    As described in this Complaint, VSP did not reasonably protect, secure or store Plaintiffs' and Class Members' sensitive health information, but rather intentionally and knowingly granted Meta and Google access to their confidential information.

---

[6] *Notice of Privacy Practice*, VSP, https://www.vsp.com/legal/nopp (last visited May 1, 2024)

15.     VSP's actions constitute a reckless disregard for the privacy of its patients' sensitive health information and its duties as a healthcare provider, an extreme invasion of Plaintiffs' and Class Members' right to privacy, and a violation of state statutory and common law.

## PARTIES

### A.     Plaintiff Mariana Tendick

16.     Plaintiff Marianna Tendick is a resident of Martinez, CA, Contra Costa County. Plaintiff Tendick visited and used Defendant's website regularly between November 2021 and October 2023, while she was a VSP member. Plaintiff Tendick used Defendant's website to look at her vision insurance, check her benefits, make payments, and find a doctor.

17.     Pursuant to the systematic process described herein, Defendant assisted Meta and Google with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information, and related confidential information. Defendant assisted these interceptions without Plaintiffs' knowledge, consent, or express written authorization.

18.      By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected health information.

### B.     Plaintiff Peter Hahn

19.     Plaintiff Peter Hahn is a resident of Itasca, IL, DuPage County. Plaintiff Hahn visited and used Defendant's website in July 2024, while he was a VSP member. Plaintiff Hahn used Defendant's website to look at his vision insurance, check his benefits, and find a doctor.

20.     Pursuant to the systematic process described herein, Defendant assisted Meta and Google with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information, and related confidential information. Defendant assisted these interceptions without Plaintiffs' knowledge, consent, or express written authorization.

4

21.     By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected health information.

**C.      Vision Service Plan**

22.     Defendant Vision Service Plan is incorporated in California and has a principal place of business at 3333 Quality Drive, Rancho Cordova, California 95670.[7]

<u>**JURISDICTION AND VENUE**</u>

23.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over VSP because VSP deliberately targeted and exploited the Illinois market by acquiring customers within the state of Illinois, and operating its website and acquiring consumers' data within the Illinois market. Plaintiffs' claims therefore arise out of or relate to VSP's contacts with the state of Illinois.

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.* (the Electronic Communications Privacy Act). This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because: the proposed class exceeds 100 persons, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state from VSP's home state.

25.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

26.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this court has personal jurisdiction over VSP.

---

[7] *See Contact VSP Vision*, VSP, https://vspvision.com/utility/contact.html (last visited May 1, 2024).

## FACTUAL BACKGROUND

### A.  THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

27.     The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq*., prohibits the intentional interception of the contents of any electronic communication or inducing another to intercept any electronic communication. 18 U.S.C. § 2511.

28.     As relevant here, a defendant violates 18 U.S.C. § 2511(1)(a) when they: "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication."

29.     The ECPA applies to software and not just traditional wiretapping technology. *See Yockey v. Salesforce, Inc.*, 2024 WL 3875785, at *8 (N.D. Cal. Aug. 16, 2024) (Affirming that the ECPA applies to software.); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1087 (N.D. Cal. 2015) ("Carrier IQ Software is an '[e]lectronic, mechanical, or other device' which 'can be used to intercept a wire, oral, or electronic communication" pursuant to the federal Wiretap Act); *United States v. Hutchins*, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the Wiretap Act").

30.     The ECPA also provides a private right of action providing for relief in the form of declaratory relief, reasonable fees, and damages in the amount of whichever is greater, (a) actual damages and any profits made by the violator as a result of the violation or (b) statutory damages of whichever is greater, $100 a day for each violation or $10,000. 18 U.S.C. § 2520.

### B.  The California Invasion of Privacy Act

31.     The California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq*., prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

32. As relevant here, a defendant violates § 631(a) of CIPA when the defendant "by means of any machine, instrument, contrivance, or in any other manner" does any of the following:

    a)     intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or

    b)     willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California; or

    c)     uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or

    d)     aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above.

Cal. Penal Code § 631.

33. Section 631(a) applies not only to phone lines, but also to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

34.     Under CIPA, Plaintiffs and Class Members may seek injunctive relief and statutory damages of $5,000 per violation. Cal. Penal Code § 637.2.

### C.     The Meta Pixel and Google Analytics

35.     Meta, through its Meta Pixel, and Google, through its Analytics Tools, compile analytics data for website owners when users visit their websites in exchange for website owners providing access to the users' browsing history and personal information for Meta's and Google's advertising purposes.

36.     This analytics data about consumers is core to Meta's and Google's business models because they use that data to better target consumers with advertising. Selling targeted advertising comprises the overwhelming majority of Meta and Google's revenues.[8] As one professor noted, Google's "business model is to collect as much data about you as possible and cross-correlate it so they can try to link your online persona with your offline persona. This tracking is just absolutely essential to their business."[9]

37.     Similarly, Meta uses this analytics data to construct data sets (referred to as "Core Audiences") which allows ad buyers to target ads to precise audiences.[10] Meta sells ads by touting its ability to target individuals by "location, age, gender, interests, demographics, behavior and connections."[11] The collection of this data is not just important to Meta and Google, it is essential to the continued existence of their businesses.

### D.     The Meta Pixel

---

[8]Advertising made up 97% of Facebook's revenue in the year 2021 and 81% of Google's revenue in Q4 2021. *Meta Reports Fourth Quarter And Full Year 2021 Results*, Facebook, https://investor.fb.com/investornews/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx; Alphabet, *Alphabet Announces Fourth Quarter and Fiscal Year 2021 Results*,
https://abc.xyz/assets/investor/static/pdf/2021Q4_alphabet_earnings_release.pdf.

[9] Lily Hay Newman, *The Privacy Battle to Save Google From Itself*, Wired (Nov. 1, 2018), https://www.wired.com/story/google-privacy-data.

[10] *Core Audiences*, Meta, https://www.facebook.com/business/news/Core-Audiences (last visited May 1, 2024).

[11] *Why advertise of Facebook, Instagram and other Meta technologies*, Meta Business Help Center, https://www.facebook.com/business/help/205029060038706 (Last accessed May 1, 2024).

38.     In 2015, the Meta Pixel[12] was announced as a tool to refine Facebook's targeted advertising.

39.     The Meta Pixel is a mechanism that loads JavaScript code that collects detailed and granular data for every interaction on a webpage.[13]

40.     Once a third-party company, advertiser, or other entity sets up the Meta Pixel on a website, the information collecting and sharing begins.

41.     Importantly, the Meta Pixel is designed so that Meta receives the information about a website user's actions contemporaneously. As soon as a website user takes any action on a webpage, the Meta Pixel redirects the user's communications to Meta.

42.     In response to congressional questioning in 2018, Facebook's CEO Mark Zuckerberg stated that the Meta Pixel "provide[s] information about users' activities off Facebook—including information about their device, websites they visit, purchases they make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook."[14]

43.     According to Meta, the Meta Pixel can collect anything present in http headers, which include "IP addresses, information about the web browser, page location, document, referrer and person using the website," button click data including "any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks," form field names as well as form field values if selected by the website owner, and other optional values.[15] The Meta Pixel captures at least seventeen standard events including payment information, registration for events, location search information, purchases, scheduling

---

[12] Formerly marketed as the "Facebook Pixel".

[13] Surya Mattu, Angie Waller, Simon Fondrie-Teitler, & Micha Gorelick, *How We Built a Meta Pixel Inspector,* The Markup (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.

[14] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the Comm. on Com., Sci., and Transp., 94 Cong. 115 (2018) (Post-Hearing Questions).

[15] *Meta Pixel*, Facebook, https://developers.facebook.com/docs/meta-pixel/ (last visited May 1, 2024).

information such as appointments, information that was searched for, applications, and what content was viewed.[16]

44.     Meta touts the targeting ability of the Meta Pixel, describing how it can help advertisers create "Custom Audiences," tailoring advertisements to target people who have visited a website.[17] Meta also describes how information harvested by the Meta Pixel can build "Lookalike Audiences," by analyzing the information and generating a similar group of people for targeting.[18] Lookalike Audiences are intended to "have interests, likes, and demographic stats similar to the people who are already engaging with your website and ads."[19] To do this, Meta naturally needs to analyze these types of information after they are intercepted and correlated by the Meta Pixel. Meta states that, "[t]o create a lookalike audience, our system leverages information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[20]

45.     The Meta Pixel allows website owners to create a library that logs every time a website visitor takes an action (an "event") that the website owner wants to track (a "conversion"). All tracked conversions are then stored so that the website owner can analyze the data collected.[21]

---

[16] Casandra Campbell, *How To Set Up and Use Meta Pixel (Formerly Facebook Pixel)*, Shopify (Jan. 22, 2024), https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier (last visited May 1, 2024).

[17] *About website custom audiences*, Meta Business Help Center, https://www.facebook.com/business/help/610516375684216 (last visited May 1, 2024).

[18] *About lookalike audiences*, Meta Business Help Center, https://www.facebook.com/business/help/164749007013531 (last visited May 1, 2024).

[19] Casandra Campbell, *How To Set Up and Use Meta Pixel (Formerly Facebook Pixel)*, Shopify (Jan. 22, 2024), https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier.

[20] *About lookalike audiences*, Meta Business Help Center, https://www.facebook.com/business/help/164749007013531 (last visited May 1, 2024).

[21] *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/, (last visited May 1, 2024).

46.     There are currently more than five million websites using the Meta Pixel.[22] On each of those websites, Meta Pixel collects and sends information to Meta via scripts running in a person's internet browser. That data is then delivered to Meta in "data packets" labeled with personally identifiable information ("PII"), including the user's IP address.

47.     If a person is not logged in to Facebook at the time, Meta uses personal information a user enters in form fields to match them to their Facebook and/or Instagram profile through a process called Advanced Matching.[23] With this process, Meta collects emails, first and last names, phone numbers, birthdates, and addresses, then uses that information to connect event tracking data to a specific Facebook profile.

48.     Even if a person does not have a Facebook account, has never registered for an account, has never so much as looked at a Facebook or Meta privacy policy, and has no intention of ever joining any social media platform, Meta still collects data on that person. When asked by Congress about this maintenance of "shadow profiles" with data of non-users of Facebook, Mark Zuckerberg responded, "we collect data on people who have not signed up for Facebook for security purposes."[24]

49.     Through this data collection process, Meta is able to provide its marketing partners with direct and detailed insight into website users' activities, allowing them to track website visitor actions, define custom audiences to better target ads to potential customers,[25] and create lookalike audiences to "reach new people who are likely to be interested in [their]

---

[22] *Facebook Pixel Usage Statistics*, Built With, https://trends.builtwith.com/analytics/Facebook-Pixel, (last visited May 1, 2024).

[23] *About advanced matching for web*, Meta Business Help Center, https://www.facebook.com/business/help/611774685654668 (last visited May 1, 2024).

[24] Taylor Hatmaker, *Zuckerberg Denies Knowledge of Facebook Shadow Profiles*, TechCrunch (Apr. 11, 2018), https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/.

[25] *Get Started*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 1, 2024).

business because they share similar characteristics to [the business's] existing customers."[26] Put differently, once the sensitive health information is intercepted and collected by the Meta Pixel, Meta processes this information, analyzes it, and assimilates it to provide targeted advertisements to businesses such as VSP. Thus, upon information and belief, Meta regularly viewed and used the sensitive health information collected by the Meta Pixel in connection with providing targeted advertising.

      **E.**      **Google Analytics**

      50.      Google offers a range of advertising software, the most important of which for our purposes is Google Analytics.

      51.      "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[27] This is made possible by Google Analytics, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[28] Google even advertises this as a service that can "[m]onitor activity on your site as it happens."[29]

      52.      In the same manner as Meta, Google uses consumer data collected through Google Analytics to improve its advertising capabilities by more accurately targeting consumers with advertising based on their interests and behaviors.

      53.      Further, Google Analytics collects consumers' IP addresses to facilitate and track internet communications. Simply put, Google can use the information that VSP discloses to identify a specific consumer's actions on VSP's website. An IP address is a number that

---

[26] *About lookalike audiences*, Meta Business Help Center,
https://www.facebook.com/business/help/164749007013531 (last visited May 1, 2024).

[27] *How Google Analytics Works*, Analytics Help,
https://support.google.com/analytics/answer/12159447?hl (last visited May 1, 2024).

[28] *Id.*

[29] *The finer points*, Google Marketing Platform,
https://marketingplatform.google.com/about/analytics/features/ (last visited May 1, 2024).

identifies a specific device connected to the Internet and its geolocation. Additionally, under HIPAA, an IP address is considered personally identifiable data.[30]

54.     Google Analytics offers website owners an opt-in IP anonymization feature.[31] According to Google, this feature is designed to help site owners comply with their own privacy policies and the recommendations of data protection authorities.[32] If the IP anonymization feature is enabled by the website owner, an additional parameter is added to the communications between a website visitor's computer and the Google Analytics server, defined as aip=1 (see example in the image below).

---

[30] 45 C.F.R. § 164.514(b)(2)(i)(0).

[31] *[UA] IP masking in Universal Analytics*, Analytics Help, https://support.google.com/analytics/answer/2763052?hl=en (last visited May 1, 2024).

[32] *Id.*



55. Accordingly, when the "aip" parameter does not appear, the IP address is not anonymized, which enables Google to identify the consumer's IP addresses and their online actions.

56. VSP does not enable the IP anonymization feature on their website. This is confirmed by the absence of the "aip" parameter, as shown in the image below:

v: 1

_v: j98

a: 949483212

t: data

ni: 1

qt: 219

_s: 2

dl: https://www.vsp.com/eye-doctor?searchBy=location&zip=90004&pageNum=1&pageSize=10&doctorType=OD&n
etwork=Choice&language=English&distance=50&gender=M&services=exam,RTLIM

ul: en-us

de: UTF-8

dt: Eye Doctors Near Me

sd: 24-bit

sr: 1920x1080

vp: 950x929

je: 0

_u: SDCACEABRAAAACAGK~

jid:

gjid:

cid: 1519611142.1663586741

tid: UA-58613015-55

_gid: 1632815375.1669022948

gtm: 2wgb90TFHSZ2W

cd10: not available

cd122: https://www.vsp.com/eye-doctor/state-search

cd124: /eye-doctor

z: 318721327

57. By installing and using Google Analytics without the anonymized IP feature, VSP intentionally and secretly discloses to Google its users' online activity, along with their IP addresses, without consent to share that information.

### F. How VSP Disclosed Plaintiffs' and Class Members' Protected Health Information and Assisted with Intercepting Communications

58. Upon entering Defendant's website, consumers can simply browse the website or log into their account. When consumers log into their accounts, their VSP membership status and login activities are shared with both Google and Meta (see images below).

```
Protocol: https
    Host: www.google-analytics.com
    Path: /collect
PARAMETERS
        v: 1
       _v: j100
        a: 618919667
        t: event
       ni: 0
       _s: 1
       dl: https://www.vsp.com/
       dr: https://apias.vsp.com/
       ul: he-il
       de: UTF-8
       dt: My Vision Benefits Dashboard
       sd: 24-bit
       sr: 1920x1080
       vp: 1068x929
       je: 0
       ec: Body
       ea: Click
       el: Member ID Card - View Member ID Card
       _u: SCCACEATKAAAAGADIAC~
      jid:
     gjid:
      cid: 923691863.1685606673
      uid: fe8e1af15abdb9ce9914181018a6e9f70b25e276e99192dac5cac379127efaf6
      tid: UA-58613015-2
     _gid: 619875092.1685606673
     gtm: 45He35v0n81TFHSZ2W
    cd10: Logged In
    cd93: 363847570-43819259
    cd95: 148995481
   cd113: fe8e1af15abdb9ce9914181018a6e9f70b25e276e99192dac5cac379127efaf6
   cd116: A
```

METHOD: GET +

URL

```
+ https://www.facebook.com/tr/?id=2440743496196143&ev=PageView&dl=https%3A%2F%2Fwww.v
sp.com%2Fmy-account%2Fmember-id-card%3F_filteredParams%3D%257B%2522unwantedParams%252
2%253A%255B%255D%252C%2522restrictedParams%2522%253A%255B%255D%257D&rl=https%3A%2F%2F
apias.vsp.com%2F%3F_filteredParams%3D%257B%2522unwantedParams%2522%253A%255B%255D%252
C%2522restrictedParams%2522%253A%255B%255D%257D&if=false&ts=1685633715713&sw=1920&sh=
1080&v=2.9.104&r=stable&ec=12&o=28&fbp=fb.1.1681761187966.1135332191&it=1685632983617
&coo=false&rqm=GET
```

HEADERS

```
:authority:       www.facebook.com
:method:          GET
:path:            /tr/?
                  id=2440743496196143&ev=PageView&dl=https%3A%2F%2Fwww.vsp.com%2F
                  my-account%2Fmember-id-
                  card%3F_filteredParams%3D%257B%2522unwantedParams%2522%253A%255
                  B%255D%252C%2522restrictedParams%2522%253A%255B%255D%257D&rl=ht
                  tps%3A%2F%2Fapias.vsp.com%2F%3F_filteredParams%3D%257B%2522unwa
                  ntedParams%2522%253A%255B%255D%252C%2522restrictedParams%2522%2
                  53A%255B%255D%257D&if=false&ts=1685633715713&sw=1920&sh=1080&v=
                  2.9.104&r=stable&ec=12&o=28&fbp=fb.1.1681761187966.113533219161
                  t=1685632983617&coo=false&rqm=GET
```

16

59.     Whether logged in or just browsing the website, users can search for a doctor by clicking the "Find a Doctor" button and navigating to the "Find a Doctor" page, where they are able to search for a doctor by name, office, and location:



60.     Additionally, they can use the advanced search option to filter by type of doctor, service, location, gender, language and more.

61.     After searching for a doctor, their submitted information is automatically sent to Meta and Google through the Meta Pixel and Google Analytics, respectively. As shown in the example images below, VSP's site transmits to Meta and Google the following: the consumer searched for a male optometrist who has a practice located within 50 miles of zip code 90004, provides eye exams, and speaks English. All information collected through the Meta Pixel and Google Analytics in this way is simultaneously and contemporaneously sent to Meta's and Google's servers at the time of collection.





62.     After the consumer selects a doctor from the search results page, VSP transmits the name of the doctor to Meta and Google. As shown in the example images below, VSP transmits to Meta and Google that the consumer clicked on the profile page of Dr. Timothy Wong OD APC along with whether the patient clicked on the doctor's phone number to contact them.







```
:authority: www.google-analytics.com

:method: GET

:path: /collect?v=1& v=j98&a=949483212&t=event&ni=0&_s=1&dl=https%3A%2F%2Fwww.vsp.com%2Feye-doctor%
2Fpractice%2FCA%2Flos-angeles%2F6430-w-sunset-blvd-ste-703%2Ftimothy-wong-od-apc%2F93648&ul=en-us&
de=UTF-8&dt=Timothy%20Wong%20O%20Apc%20%7C%20VSP%20Eye%20Doctor%20Near%20Me&sd=24-bit&sr=1920x108
0&vp=950x929&je=0&ec=Outbound%20Link%20Click&ea=www.vsp.com&el=%20-%20323-464-3228&_u=SDCACEALRAAA
ACAOK~&jid=&gjid=&cid=1519611142.1663586741&tid=UA-58613015-55&_gid=1632815375.1669022948&gtm=2wgb
90TFHSZ2W&cd10=Guest&cd93=539563685-4268097347&cd122=https%3A%2F%2Fwww.vsp.com%2Feye-doctor%2Fstat
e-search&cd124=%2Feye-doctor%2Fpractice%2FCA%2Flos-angeles%2F6430-w-sunset-blvd-ste-703%2Ftimothy-
wong-od-apc%2F93648&z=172156432

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7

referer: https://www.vsp.com/
```

63.     Further, any information submitted by the consumer through the search bar (e.g.,
doctor, specialty, type of treatment, etc.) on the site's homepage is shared with Meta and Google,
as demonstrated in the images below.





64.     In short, nearly all of the information that consumers submit to VSP.com will be surreptitiously and simultaneously transmitted to Facebook and Google without consumer consent.

65.     VSP knowingly and intentionally installed Meta Pixel and Google Analytics to collect consumer data and in doing so VSP failed to take reasonable steps to secure and protect its users' information from unnecessary, non-consensual disclosure. Instead, VSP knowingly and intentionally granted third parties the ability to surreptitiously record and collect consumer information. The Meta Pixel and Google's Analytics platforms cannot be installed accidentally.

VSP purposely installed both platforms on its website with the intent to collect data about consumers.

G. **VSP Violated both Industry Standards and Federal Warnings regarding Tracking Codes on Healthcare Websites**

66.     Defendant's tracking of consumer behavior falls well outside of consumers' reasonable expectations of privacy regarding their health data. For example, the American Medical Association's (the "AMA") Code of Ethics lists "safeguard[ing] patient confidences and privacy" as one of its core principles.[33]

67.     Further, AMA ethics opinion 3.2.4 regarding access to medical records by data collection companies reads in part:

> Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. [34]

68.     In addition, the federal government has issued guidance warning that tracking code like the Meta Pixel and Google Analytics may violate federal privacy law when installed on healthcare websites like VSP's. The statement—titled Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (the "Bulletin")—was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022 and further clarified in March 2024.[35]

---

[33] *Code of Medical Ethics*, American Medical Association, https://code-medical-ethics.ama-assn.org/principles.

[34] *Opinion 3.2.4 Access to Medical Records by Data Collection Companies*, American Medical Association, https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.

[35] *Use Of Online Tracking Technologies By Hipaa Covered Entities And Business Associates*, HHS.gov, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last accessed May 1, 2024) (emphasis in original).

69.     Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as the Meta Pixel and Google Analytics, in a limited way, to perform analysis as part of the entity's health care operations, such as gathering innocuous data which does not include patient information. They are however, not permitted to use these tools in a way that may cause an unauthorized exposure of patients' Protected Health Information ("PHI") to external vendors. The Bulletin explains

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

70.     Further, the Bulletin discusses how businesses associated with covered entities may violate HIPAA with similar disclosures of PHI:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.*, health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate, and a BAA is required.

71.     The Bulletin discusses the types of harm that disclosures of PHI may cause to a patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health,

or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

72.     Plaintiffs and class members face exactly the risks highlighted in the Bulletin. VSP disclosed the fact that Plaintiffs and class members sought out or took steps to book ophthalmologic care on VSP's website, which in turn also discloses the health conditions for which they seek a health care provider; the frequency with which they take steps relating to obtaining eye health care; and where they seek medical treatment. Per the Bulletin, this information is "incredibly sensitive."

73.     The Bulletin goes on to discuss the exact nature of the disclosures required and how standard disclosures like privacy policies, notices, cookie policies, or even de-identification would not meet the bar required under HIPAA. The Bulletin says:

Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. … If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individuals' HIPAA-compliant authorizations are required **before** the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do **not** constitute a valid HIPAA authorization. … Further, it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed

BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.[36]

74. To be clear, VSP's conduct violates the rules outlined by the AMA and the OCR's Bulletin regarding the appropriate use of tracking technologies on websites.

## CLASS ALLEGATIONS

75. **Class Definition**: Plaintiffs bring this action on behalf of themselves and other similarly situated individuals (the "Federal Law Class"), defined as United States citizens who, during the class period, had their personally identifiable information or protected health information disclosed to Meta or Google as a result of using www.VSP.com.

76. In addition, Plaintiffs bring this lawsuit on behalf of the following Class (the "California State Law Class") defined as citizens of the state of California who, during the class period, had their personally identifiable information or protected health information disclosed to Meta or Google as a result of using www.VSP.com.

77. Plaintiffs reserve the right to modify the class definition or add subclasses as necessary prior to filing a motion for class certification.

78. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on August 1, 2024.

79. Excluded from the Federal Law Class and California State Law Class (collectively, the "Class") is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

80. **Numerosity/Ascertainability**: Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class

---

[36] *Id.* (emphasis in original).

Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Meta's and Google's records.

81. **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used www.VSP.com and had their personally identifiable information and protected health information disclosed to Meta and Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of Class members.

82. **Adequacy**: Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

83. **Common Questions of Law and Fact Predominate/Well Defined Community of Interest**: Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

  a) Whether Defendant intentionally tapped the lines of internet communication between patients and their eye health providers;

  b) Whether VSP's website surreptitiously records personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, discloses that information to Meta and Google;

  c) Whether Meta and Google are third-party eavesdroppers;

d)      Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e)      Whether Defendant's conduct, which allowed Meta and Google—unauthorized persons—to view Plaintiffs' and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f)      Whether Defendant violated Plaintiffs' and Class Members' privacy rights by using the Meta Tracking Pixel and Google Analytics to record and communicate online patients' FIDs and IP addresses alongside their confidential medical communications; and

g)      Whether Plaintiffs and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statute.

84.    **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq.***

85.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

86.     Plaintiffs bring this claim individually and on behalf of the Class.

87.     The Electronic Communications Privacy Act ("ECPA") is codified at 18 U.S.C. § 2510, *et seq*.

88.     The ECPA prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

89.     The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

90.     To state a claim under the ECPA plaintiffs must plausibly allege that Defendant (1) intentionally (2) intercepted (3) the contents of (4) plaintiffs' electronic communications (5) using a device. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003).

91.     Through the use of the Meta Pixel and Google analytics, Defendant intentionally, surreptitiously, and contemporaneously duplicated and forwarded Plaintiffs' electronic communications, including sensitive healthcare data, to unauthorized third parties.

92.     The transmissions of data between Plaintiffs and Class members and VSP qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

93.     At all relevant times, VSP engaged Meta and Google to track and intercept Plaintiffs' and Class Members' internet communications while accessing www.VSP.com. These communications were intercepted without the authorization and consent of Plaintiffs and Class Members.

94.     VSP intentionally installed Meta Pixel and Google Analytics on its webpage and intended to help Meta and Google learn the information and content that webpage visitors requested and submitted to www.VPS.com, in real time.

95.     Each time Plaintiffs' and Class Members' information was sent to Meta or Google, the third-party viewed the intercepted information and processed it for its own business purposes-namely to create targeted advertising based on that information.

96.     The Meta Pixel, and similar technologies such as Google analytics, are "devices" for the purposes of the ECPA. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1080

(N.D. Cal. 2023) (affirming that the Meta Pixel is a "device" under the ECPA); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) (affirming that a similar tracking technology which forwarded customer data to a company is a "device" under the ECPA).

97.     As alleged above, VSP violated the ECPA by aiding and permitting third parties to receive its users' online communications through its website without their consent.

98.     In inducing and communicating private patient information to Meta and Google VSP's intent was tortious, criminal, and in violation of state laws including the CIPA, through conversion, or as a violation of the HIPAA. Further, Meta and Google's purposefully collected private and sensitive patient information with the intent to gain deeper insights into Class members in furtherance of their advertising businesses.

99.     As a result, Plaintiffs and Class members seek relief under 18 U.S.C. § 2520 including reasonable fees and damages in the amount of whichever is greater, (a) actual damages and any profits made by the violator as a result of the violation or (b) statutory damages of whichever is greater, $100 a day for each violation or $10,000. 18 U.S.C. § 2520.

## COUNT II
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 631
### (On Behalf of the California State Law Class)

100.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

101.     Plaintiff Tendick brings this claim individually and on behalf of the California State Law Class.

102.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code § 630 et seq.

103.      California Penal Code § 631(a), is violated if "by means of any machine, instrument, or contrivance, or in any other manner," a person either:

> 1.     Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire,

line, cable, or instrument of any internal telephonic communication system;

2.      willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;

3.      uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or

4.      aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

104.    Section 631(a) applies to internet communications and thus applies to Plaintiff Tendick's and California State Law Class Members' sensitive health information which was shared by VSP through the Meta Pixel and Google Analytics. *See Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" ((citing Cal. Penal Code § 631(a))); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing histories).

105.    VSP's use of Meta Pixel and Google Analytics is a "machine, instrument, contrivance, or . . . other manner" used to engaged in the prohibited conduct at issue here.

106.    At all relevant times, VSP engaged Meta and Google to track and intercept Plaintiff's and Class Members' internet communications while accessing www.VSP.com. These communications were intercepted without the authorization and consent of Plaintiff and California State Law Class Members.

107. VSP intentionally installed Meta Pixel and Google Analytics on its webpage and intended to help Meta and Google learn the information and content that webpage visitors requested and submitted to www.VPS.com, in real time.

108. Each time Plaintiff Tendick's and California State Law Class Members' information was sent to Meta or Google, the third-party viewed the intercepted information and processed it for its own business purposes-namely to create targeted advertising based on that information.

109. As alleged above, VSP violated CIPA by aiding and permitting third parties to receive its users' online communications through its website without their consent.

110. As a result, Plaintiff Tendick and California State Law Class members seek relief under Cal. Penal Code § 631, including statutory damages of $5,000 per violation under Section 637.2.

## COUNT III
### Conversion
**(On Behalf of the all Class Members)**

111. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

112. Plaintiffs bring this claim individually and on behalf of themselves and all Class Members.

113. Plaintiffs and Class Members have a property interest in their internet browsing data and sensitive health information. They have exclusive access and control over their data, and it can only be created and subsequently shared to the sites they navigate and submit it to through their actions.

114. Defendant's surreptitious interception and dissemination of the Plaintiffs' and Class Member's data is a wrongful disposition of their property right, in that it deprives the Plaintiffs and Class Members of their ability to control access to that property. Defendant has intentionally used the Meta Pixel and Google Analytics to intercept and transmit the Plaintiffs' and Class Members' sensitive health information and browsing data without their consent.

115.     Damages caused by conversion are the value of the property at the time of conversion, with the interest from that time. For the Plaintiffs and Class Members this is the fair market value of their data at the time of the conversion, which is readily ascertainable due to the data's value to Meta and Google as part of their revenue model described earlier in the complaint.

116.     Plaintiffs and Class Members are also entitled to punitive damages. By purposefully and non-consensually sharing consumers sensitive health information and browsing data with third parties, Defendant has maliciously disregarded Plaintiffs' and Members' property rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of herself and the proposed Class respectfully request that the Court enter an order:

A.     Certifying the Class and appointing Plaintiffs as the Class representatives;

B.     Appointing Plaintiffs' counsel as class counsel;

C.     Finding that Defendant's conduct was unlawful, as alleged herein;

D.     Awarding declaratory relief against Defendant;

E.     Awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury on all matters so triable.


Dated: December 4, 2024                           Respectfully submitted,

                                    By:     /s/ Justin N. Boley

                                    Kenneth A. Wexler
                                    Justin N. Boley
                                    Zoran Tasić
                                    Gwyneth F. Lietz
                                    **WEXLER BOLEY & ELGERSMA LLP**
                                    311 S. Wacker Drive, Suite 5450
                                    Chicago, IL 60606
                                    Telephone: (312) 346-2222
                                    Facsimile: (312) 346-0022
                                    kaw@wbe-llp.com
                                    jnb@wbe-llp.com
                                    zt@wbe-llp.com
                                    gfl@wbe-llp.com

                                    Daniel C. Hedlund (Pro Hac Vice
                                    forthcoming)
                                    Daniel J. Nordin (Pro Hac Vice forthcoming)
                                    Mary M. Nikolai (Pro Hac Vice forthcoming)
                                    **GUSTAFSON GLUEK PLLC**
                                    Canadian Pacific Plaza
                                    120 South Sixth Street, Suite 2600
                                    Minneapolis, MN 55402
                                    Telephone: (612) 333-8844
                                    dhedlund@gustafsongluek.com
                                    dnordin@gustafsongluek.com
                                    mnikolai@gustafsongluek.com

                                    Brett Cebulash (Pro Hac Vice forthcoming)
                                    Kevin Landau (Pro Hac Vice forthcoming)
                                    Joshua Hall (Pro Hac Vice forthcoming)
                                    **TAUS, CEBULASH & LANDAU, LLP**
                                    123 William St., Suite 1900A
                                    New York, NY 10038.
                                    Telephone: (212) 931-0704
                                    Facsimile: (212) 931-0703
                                    bcebulash@tcllaw.com
                                    klandau@tcllaw.com
                                    jhall@tcllaw.com


                                    *Attorneys for Plaintiffs and Proposed Class*